# Nicholson *v.* Daniel, Appellant.

[Marked to be reported.]

*Trusts and trustees—Compensation of clergymen—Church law.*

Defendant, a clergyman of the Protestant Episcopal Church, desiring to establish a mission church in a suburb of Philadelphia inhabited by poor people, obtained the consent of the rectors of the three nearest parishes, in accordance with the canons of the church. One of these rectors and another clergyman agreed to act with the defendant as trustees. A deed to the trustees conveying the real estate for the church edifice provided that the incumbent should be independent in his pastoral functions, except to his canonical superiors. It was understood that defendant was to rely on the offerings of the people for his support, with such aid as he could obtain from outside sources. No pews were to be sold or rented in the church. The defendant assumed control, personally managing both the temporal and spiritual affairs of the church, and during his incumbency of eleven years collected $33,821.08, keeping accurate account of all receipts. Of this sum he paid over to his cotrustee $15,836.46, specially contributed for building or other trust purposes. He also paid out $2,400 for which he did not take receipts. The balance, $15,600, he claimed to retain for his salary during the time he was engaged in the work. There was no evidence that the salary claimed was excessive, but two clergymen testified that it was proper. The testimony showed that defendant had invested in his wife's name $8,100. It also appeared that he had constantly given away food and money, which had come out of the balance retained on account of salary. During a portion of the time of defendant's incumbency it appeared that the salary paid to missionaries by the Episcopal Church was $900 to $1,000. The master and court below allowed the defendant $1,000 a year, and surcharged him with the balance which he had retained. *Held,* to be error.

Defendant's cotrustees had no more control of the compensation of the incumbent than they had over the salary of any other incumbent in the diocese. If appellant had failed in his enterprise and been unable to obtain bread for his family, neither plaintiffs nor the church could have been required to furnish it. Having succeeded to a reasonable extent, and having provided the food for his family, neither the plaintiffs nor the church will be permitted to take it out of their mouths; and if by reason of economy and

good management he has saved a little as a provision for his family, it is no concern of the plaintiffs, unless they first show that the savings referred to were filched from the money which was contributed for the specific object of erecting the church edifice and building of the church. This has not been done: Per PAXSON, C. J.

Argued Jan. 18, 1893. Appeal, No. 6, Jan. T., 1893, by defendants, Charles S. Daniel and wife, from decree of C. P. No. 2, Phila. Co., June T., 1890, No. 557, on bill in equity by Isaac L. Nicholson and Robert Ritchie. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Bill in equity for an account.

The bill averred that on April 3, 1880, Frederick V. Smith conveyed a lot of ground at the southeast corner of Twenty-eighth and Susquehanna avenue, to the plaintiff, Ritchie, and the defendant, Chas. S. Daniel, upon the following trusts:

" First, that the rector of the Church of St. James the Less (a Protestant Episcopal Church in the city of Philadelphia), for the time being, ex-officio, (the said Robert Ritchie being now such rector), the said Charles S. Daniel and his successors for the time being in this trust, and a third trustee who shall be a priest of the Protestant Episcopal Church in the diocese of Pennsylvania, to be appointed from. time to time by the rector for the time being of said Church of St. James the Less, by an instrument of writing to be signed, sealed and duly ac- knowledged by him, and recorded in the office for recording deeds, etc., in Philadelphia, shall be a board of trustees, whose duty shall be to hold the said lot or piece of ground and to. build or cause to be built thereon a church edifice for the pur-. pose of worship and other church work of the Protestant Episcopal Church in the United States of America.

" Second. The rector of the Church of St. James the Less, for the time being, to be, ex-officio, always a trustee, the Rev. Charles S. Daniel aforesaid and the other trustee, to be ap- pointed as aforesaid; to continue to be such trustees until their death, resignation, or canonical removal from the diocese re- spectively. In either of these events the rector of the Church of St. James the Less shall appoint some priest of the diocese to be the successor of the trustee who goes out, in like manner as is hereinbefore provided as to said third trustee and to hold for a like term.

" Third. The rector of the said Church of St. James the Less for the time being and ex-officio shall always from time to time appoint the incumbent or pastor of the new church, to be built as aforesaid, after the Rev. Charles S. Daniel aforesaid, who shall be the first incumbent.

" Fourth. The said incumbent shall always be a clergyman of the said diocese in good standing, or shall become such as soon after his acceptance of the charge as conveniently may be, and shall be independent in his pastoral functions of any control of the trustees, or of any other ecclesiastical power than that involved in his canonical obligations.

" Fifth. If a vacancy in the incumbency should occur at a time when there is no rector of the said Church of St. James the Less the other trustees or trustee, as the case may be, shall provide for clergymen to carry on the work temporarily until there shall be a rector of said Church of St. James the Less.

" Sixth. No pews or seats shall ever be rented or sold in the new church aforesaid.   It is to be always free.

" Seventh. The trustees for the time being shall have power by a unanimous vote, taken at a time when there is a rector of said Church of St. James the Less, to apply for, procure, and accept a charter of incorporation under which the premises aforesaid and all the property embraced in this trust may be transferred to a parish corporation, relieving the said trustees of their trusts under this instrument, provided that no power shall be given by such charter to rent or sell pews or seats, but that the church shall continue to be always free."

That in pursuance of the trust Ritchie by deed appointed Nicholson the third trustee ; that at the time of the execution of the two indentures Ritchie was the rector of the Church of St. James the Less, and Daniel was the incumbent of the church to be built according to the terms of the deed of April 3, 1880, the said church being known as the Church of St. Chrysostom ; that the plaintiffs and defendant thus became a board of trustees whose duty it was to hold the land conveyed and to cause to be built thereon a church edifice for the purpose of worship and other church work of the Protestant Episcopal Church ; that F. V. Smith, by deed dated July 9, 1885, and duly recorded, conveyed to the plaintiffs and Daniel another piece of ground adjoining the one first granted ; that all

of the trustees accepted the trust; that it was agreed among them that Ritchie was to act as treasurer of the board; that Daniel was authorized to collect moneys from various sources for the purpose mentioned in the trust deeds, which moneys he was to account for to the trustees and to pay over to the said Ritchie, as treasurer, from time to time; that Daniel collected moneys for the said purpose but had paid over to Ritchie a portion only of said funds; that he had retained and had not accounted for other moneys which he had applied to purposes not authorized by the trust deed, invested in his own name or otherwise diverted from the trust; that plaintiffs had required account of such moneys; that the defendant Daniel had made contradictory statements in relation to them, and refused to give any information; that the moneys had been invested by Daniel in real estate in Philadelphia and Bucks county, Pa., the title to which is in the name of Daniel and his wife.

The prayers were : (1) Discovery generally. (2) An account of the funds collected. (3) Discovery of real and personal property in which trust moneys have been invested. (4) A decree that the defendant transfer all personal property and convey all real estate which upon such accounting may appear to belong to the trust. (5) An injunction from disposing of such personal and real estate. (6) Other relief.

The answers of defendants denied the right of plaintiffs to an account.

The case was referred to E. Hunn Hanson, who recommended a decree directing the defendant to pay to the plaintiff the sum of $4,850. The facts of the case appear by the opinion of the Supreme Court. The defendant filed the following exceptions, inter alia, to the master's report :

" 8. In refusing to find as a fact that the $15,600 retained by Mr. Daniel included small charities. [4]

" 9. In treating Mr. Daniel as a missionary in the sense which that word is used in the Protestant Episcopal Church in the Diocese of Pennsylvania. [7]

" 10. In ignoring the distinction between a missionary and an incumbent, independent of any control in his pastoral relations other than that involved in his canonical obligations. [8]

" 11. In finding that during or about the last year of the charge of the defendant, $1,000 had been fixed ' by the eccle-

siastical authority as the minimum to which such missionaries were entitled.' [10]

" 12. In reporting that 'there was evidence to show the kind and character of work done by Mr. Daniel, but whether it was similar to or different from that of missions like that in his charge, was not shown,' in view of the testimony that there was no mission in the city of Philadelphia which resembled St. Chrysostom's Church. [9]

" 14. In not finding that Mr. Daniel's liability to account under the trust deed extended no further than to the moneys received by him for the purchase, erection and maintenance of the church edifice and buildings. [1]

" 16. In interpreting the clause of the trust deed which permitted the trustees, in a certain contingency only, viz.: vacancy in the rectorship of the Church of St. James the Less, to appoint a successor to Mr. Daniel to carry on ' the work,' as entitling the trustees to exact an account from Mr. Daniel, who was neither appointed by nor removable by them, of expenditures made in carrying on church and charitable work, generally, and of sums collected or received by him for such purpose. [2]

" 17. In not finding that for the sum of $2,869.64, which was sent Mr. Daniel to be used at his personal and absolute discretion, he was not, in any view of the case, bound to account to the trustees. [3]

" 18. In not finding that the sum of $15,600 taken by Mr. Daniel by way of compensation and including, as he claimed, many small charities, was a sum which he might reasonably and properly have taken for that purpose. [5]

" 19. In not finding that as no salary was either fixed by the trustees or assured to Mr. Daniel from any quarter, and that it was expressly agreed that he should live from the offerings, a discretion was vested in Mr. Daniel as to the amount he would take as such compensation, and that the only restraint upon him was that he should exercise such discretion in good faith. [6]

" 20. In recommending a decree surcharging Mr. Daniel with the sum of $4,850 with interest from Sept. 23, 1889, and ordering him to pay all charges and costs of the case." [11]

The exceptions were dismissed, and a decree entered in accordance with the recommendations of the master.

*Errors assigned* were (1–11) dismissal of exceptions, quoting them ; (12) decree of court, quoting it ; (13) in not dismissing the bill.

*Henry Budd*, for appellant.—The trust relation of appellant and appellees extended only to the real estate, and, as it is not pretended that Mr. Daniel did not, from time to time, account for every cent received by him on account of the real estate, or for ground rent, church and parish building erection, etc., there was no ground for the exaction from him of any account, and the court below erred in not dismissing the bill.

The position of the incumbent of St. Chrysostom's and that of the missionary, in the sense used by the church in the diocese and by the master, are entirely different. The missionary is under orders, the incumbent not; the missionary looks to the body which sent him for salary, the incumbent was to live on what he could raise. The sum of $1,500 per year cannot be considered as anything in excess of what properly might have been taken, and, moderate as the sum is, it includes not only compensation but some charitable disbursements.

*Geo. Tucker Bispham*, *Wm. Henry Lex* with him, for appellee. — The trust deed exhibits, in general but sufficiently apt language, two paramount duties of the trustees : (1) To hold the lot of ground and to cause to be erected upon it a church building. (2) To appoint a successor to Mr. Daniel to carry on the work temporarily if the rectorship of St. James the Less be vacant ; and if it be not vacant then this duty of two trustees devolves upon one only. A less accurate declaration of trust will suffice in a trust for charity than in other cases : Perry, Trusts, 131, 450.

To carry out the first duty (although it is not explicitly stated), the collection and disbursement of money by the trustees is obviously essential. And whenever a trustee's duty requires such collection and disbursement there is a correlative duty to account ; and if there is a board of trustees the duty to account exists and may be enforced inter sese ; though the board itself may under proper conditions be made an accounting party.

The second duty required the appointment of one to carry on the "work;" such a one becomes, pursuant to the stipulation of the deed, a trustee and one of the board; and the work to be carried on is manifestly mission work. To carry on mission work requires just as markedly as does the erection of the church edifice the collection and disbursement of moneys by the appointee alone or in conjunction with his cotrustees; and there is the same duty to account with respect to such dealing as there was shown to be with respect to that under the first head.

The fact that $1,000 per annum, on an average, was a sufficient and proper allowance for the defendant's living expenses, is demonstrated by the fact that that sum was all that was actually used. It is certainly no hardship to charge the defendant with this sum. It reimburses him out of the mission funds for every penny that he expended for the support of himself and family; it gives him in addition the accumulation of all the money which he obtained from outside sources. It only takes away from him the surplus of the mission funds and applies them to the benefit of the trust, instead of making him a present of that surplus.

OPINION BY MR. CHIEF JUSTICE PAXSON, January 30, 1893:

Charles S. Daniel, the appellant in this case, is an Episcopal clergyman. He appears to have been for many years engaged in work amongst the poor, and, during the year 1879, became desirous of establishing what is called a mission church in the neighborhood of Twenty-eighth street and Susquehanna avenue. The canons of the Protestant Episcopal Church in the diocese of Pennsylvania require that before a church or mission is established the consent of the rectors of the three parishes nearest to the site of the said church or mission must be obtained. In obedience to the church canons aforesaid, the appellant applied to the Rev. Robert Ritchie, rector of the Church of St. James the Less, to know whether he could obtain his consent as one of the three nearest rectors to do such work. The required consent was obtained. It appears from the "Recital of Facts," contained in plaintiffs' paper book that the said Robert Ritchie "and his predecessors in the rectory of St. James the Less, had regarded themselves as pastorally responsible for the region

named, and many of the people had, for years, attended the Church of St. James the Less, and many had sent their children to its schools. Mr. Ritchie had felt, however, for a long time, that the district, to be effectively worked, ought to have a chapel of its own, and a priest to devote himself to it exclusively. The only obstacle to such an arrangement was the poverty of the church people. But he cherished the work. He had at one time entered into negotiations with a clergyman to this end, but they had come to nothing. Mr. Daniel proposed to rely upon the offerings of the people for his support, with such aid as could be obtained from missionary offerings from individuals of other parishes." The matter was so far proceeded with that a lot of ground was purchased, and a small chapel erected thereon, and the Rev. Isaac L. Nicholson, at that time rector of St. Marks Church, was associated with Mr. Ritchie and the appellant as trustees. The latter was installed as the first incumbent of the mission with the understanding and agreement that he should always exercise his pastoral functions independently of any control, save that of his canonical superiors in the diocese. No salary was named or provided for him, as he proposed to rely entirely upon the offerings of the people for his support. The object and purpose appear to have been " to try to carry out the principle, that a mission should be worked up without a vestry or pew rents upon sound church principles." The consent of the other two nearest rectors was obtained, and duly deposited with the secretary of the convention, according to the canons of the diocese of Pennsylvania.

The deed conveying the real estate to the trustees provides for the erection of a church edifice ; for the appointment of other trustees in case of the death, resignation, or the canonical removal from the diocese of the original trustees ; that the rector of the Church of St. James the Less, for the time being, shall always, from time to time, appoint the incumbent or pastor of the new church to be built as aforesaid, after the Rev. Charles S. Daniel, who shall be the first incumbent. The trust deed further provides, that " the said incumbent shall always be a clergyman of the said diocese in good standing or shall become such as soon after his acceptance of the charge as conveniently may be, and shall be independent in his pastoral functions of any control of the trustees or of any other ecclesiastical power

than that involved in his canonical relations." And further,
" no pews or seats shall ever be rented or sold in the new church
aforesaid. It is to be always free."

It was under these circumstances that the appellant com-
menced his work. His little chapel was called the St. Chrys-
ostom's Mission. He appears to have ministered principally
to the poor, and gathered round him a staff of workers to as-
sist him. He had no vestry, and the mission was not under
the control of or assisted by the missionary authorities of the
diocese. He had to do all the work and administer the affairs
of the mission, both spiritual and temporal. He published a
monthly paper .called St. Chrysostom, in which he was in
the habit of appealing to the public for aid, and in which he
acknowledged contributions received by him. He appears to
have been reasonably successful in his work, which continued
for a little over ten years. During that time the whole amount
received by him for all purposes was $33,821.03. Of this sum
he paid over to the Rev. Mr. Ritchie, his cotrustee, the sum
of $15,836.46. This sum, as we understand it, was specially
contributed by the donors for building purposes or other mat-
ters connected with the trust. The appellant testified that he
had paid out $2,400 at various times in small sums for which
he did not take receipts, and the balance of the sum collected,
to wit, $15,600, he claimed to retain for his salary during the
time he was engaged in the work. This claim probably never
would have been disputed, but for two reasons : First, a want
of harmony between the appellant and his cotrustees; and,
second, the fact, that during his incumbency he had saved a
little money and invested it in real estate. The amount so in-
vested the master finds to be $8,100.

It does not clearly appear at what time this want of harmony
in the board occurred. It probably commenced not later than
1885, when Dr. Nicholson ceased to aid the appellant in any
manner, and to have become very decided in 1889, as appears
from the following letter written in that year to Mr. Daniel :

" I think if you will bear with me in saying it, your very
rash and impulsive pen, and your most unfortunate way of ex-
pressing yourself concerning your brethren, in your letters, and
in your conversation, these things have been the sole cause of
all the hindrances and difficulties which have come upon the

work of the St. Chrysostom's Mission.   I do deeply regret that you have so effectually cut yourself off from the sympathy of the N. W. Convocation, and that of the whole body of the clergy.                              I. L. NICHOLSON."

No hint appears in this letter that any of the difficulties in regard to the mission were the result of the appellant's dishonesty, although Dr. Nicholson's suspicions upon this matter appear to have been aroused as early as 1885.   In 1890 the plaintiffs, as trustees, for the first time demanded an account of the appellant of the money collected by him.   This was ten years after he began his work.   The matter culminated in the filing of this bill in which Isaac L. Nicholson and Robert Ritchie were the plaintiffs and Charles S. Daniel and Sarah M. Daniel, his wife, the defendants.   The case was referred to a master, who, after a protracted hearing, reported a decree in favor of the complainants and against the defendant for the sum of $4,850 with interest from September 23, 1889, which the defendant was required to pay, together with all the costs and charges of the case.

The answer of the appellant to the bill pointedly denies " that there had been misapplication of the funds properly applicable to the trust, and avers that the allegation of the bill that Charles S. Daniel converted to his own use such moneys, is false and malicious; and that no moneys belonging to the trust have been invested, either in respondent's name or that of his wife, in real estate in Philadelphia, Bucks county or anywhere."

The separate answer of Sarah M. Daniel avers " that the allegations in the bill concerning misconduct of Charles S. Daniel were untrue, and especially denies that any trust funds had been invested in real estate and the title taken in her name, or that she holds title to any property belonging to her husband and herself.   She avers that she does not own real estate in Bucks county, but does own two houses in Philadelphia which were bought with money belonging to her, and which do not in any way represent trust moneys."

The defendant testified before the master that he had other sources of income than the collections referred to and that he earned from time to time for outside work various sums of money, which, although generally small, amounted to considerable in

the aggregate in a course of ten years. It also appears that the sum of $2,869.64 was sent to the appellant to be used at his personal absolute discretion, and for which he claims he was not in any view of the case bound to account to the trustees. It also appeared that Mrs. Daniel, at the time her husband took charge of the mission, had $500 of her own money. It is unnecessary, however, in our view of the case, to consider these collateral matters and go into the details of the amount received by the appellant for preaching, lecturing, officiating at weddings, baptisms and funerals other than his own. The learned master evidently paid no regard to the appellant's testimony upon this point, for the reason that it covered a period of from ten to fifteen years, was unsupported by any written memoranda and was vaguely indefinite. It is hardly to be expected that his testimony upon such a subject would be as precise and satisfactory as a merchant's books for goods sold and delivered. It is believed that few clergymen would be able to testify with entire accuracy as to every little fee of this nature after such a lapse of time. He might have a reasonably correct idea of average results without knowledge of details.

The learned master was probably inclined to regard the testimony of the appellant with the less favor because he had destroyed or thrown in his waste basket certain books containing entries of the moneys collected by him. It was certainly a foolish and improper thing to do, and if it had been done for the purpose of destroying testimony and to prevent his being called upon for an account of trust money in his hands, and for which he was legally accountable, it would be a serious matter. It appears to have been done, however, rather as a matter of passion than as intending any serious wrong. The books thus destroyed or thrown away were little books which had been kept from time to time, and in which was temporarily entered an account of his collections. They had been in the hands of the plaintiffs some time before they were destroyed and they had ample time not only to examine but to copy them. Moreover, the contents of these books had been carried into the parish register, which was a permanent record, and which was not destroyed nor was any attempt made to destroy or withhold it. We cannot assume, therefore, that any harm was done or intended to be done. We rather regard it as the act of a clergy-

man who, in a moment of pique, lost his head and did a very foolish thing.

In our view of the case the whole contention is narrowed down to the single question, whether the appellant was entitled to retain out of the moneys received by him the sum of $15,600 as salary or compensation for his services extending over ten years. The learned master says in his report: " It was conceded upon the argument that the controversy was substantially narrowed to the question whether such was a proper claim or not."

Upon this point the master says: " It has been also found that the salary paid Philadelphia missionaries by the Episcopal Church during nearly all the time he was missionary was $900 to $1,000. No evidence having been given that Mr. Daniel's services were worth more than the last named, that is the sum to which it is concluded he was entitled and justified in retaining, and that out of the $1,500 he must pay all beyond to the complainants. One thousand dollars a year for such a purpose is a small sum ; but the calling of a missionary is not one in which he can or ought to look for gain or money profit. His reward is elsewhere and of a different kind. Doubtless the very smallness of the salary tends to prevent that separation in feeling between himself and those in his charge which renders ineffective so much of what is known as charitable work by those well to do. In addition to this, as a clergyman of the Episcopal Church, he knew the sum to which one assuming the charge he sought would be entitled, and he ought not to demand or be permitted more. From June, 1880, to March, 1891, is ten years and nine months, and at $1,000 a year from that period amounts to $10,750. The difference between this and the $15,600 is $4,850."

We cannot assent to the conclusions of the master for various reasons. We entirely agree that $1,000 a year to an educated man, who has a wife and children to support, and who is a clergyman, is a small sum in the city of Philadelphia ; and we are not disposed to criticise his view that the calling of a missionary is not one in which he can or ought to look for gain or money profit. At the same time, even a poor missionary must be regarded as a human being. He has a stomach to be fed and a back to be clothed. He must have a house to

shelter him, and the wherewith to provide clothing for his family, and educate his children.  Moreover, he must provide them with food, and the age of miracles has long since passed away.

We think the master was mistaken in saying that no evidence had been given that Mr. Daniel's services were worth more than a thousand dollars a year.  One clergyman testified that he did not regard the compensation, claimed by the appellant as compensation, excessive.  Another testified that he regarded fifteen hundred dollars a year as a proper compensation.  I do not remember in looking through the testimony that any witness testified that the compensation was excessive.  The learned master appears to have relied upon the canon of the Episcopal Church fixing the salary of a missionary at $1,000 per year or $800 and a house, but we understand this canon was framed in 1889, which was nine years after the appellant had entered upon his work.  Aside from this, the canon referred to has nothing whatever to do with the salary of the appellant.  His position was not that of a missionary in the ordinary meaning of the word.  A missionary looks for a salary to the body or authority by whom he is sent, and the former is responsible for his support and compensation.  The appellant was, by the express terms of the arrangements between the plaintiffs and himself, required to live by voluntary contributions and what he could collect by his own exertions.  He was to be self-supporting, and under no circumstances was he to call upon the plaintiffs or upon the church for support.  Further, a missionary is constantly under orders, while the incumbent was expressly by the deed made independent of all but the canonical control of his bishop, to which all priests in the Episcopal Church are subject.

The plaintiffs had no more control of the compensation of the incumbent than they had over the salary of any other incumbent in the diocese.  If the appellant had failed in his enterprise and been unable to obtain bread for his family, neither the plaintiffs nor the church could have been required to furnish it.  Having succeeded to a reasonable extent, and having provided the food for his family, neither the plaintiffs nor the church will be permitted to take it out of their mouths; and if by reason of economy and good management he has saved a

little as a provision for his family, it is no concern of the plaintiffs, unless they first show that the savings referred to were filched from the money which was contributed for the specific object of erecting the church edifice and building up the church. This has not been done. All the money contributed for such purposes, and which comes within the trust, has been paid over to Mr. Ritchie, so far as the evidence discloses. The money contributed for the support of the appellant and his family composed no part of the trust fund, and is not liable to the control of the plaintiffs, or the church, or even of a court of equity.

Not only was the appellant required to support himself and family out of the $1,500 a year, claimed and retained by him, but the evidence discloses the fact that constant demands for charity were made upon him, and that they were responded to. In answer to the question, what was included in the $15,600 besides his own individual support and the support of his household, he testified: " It included a great many charities which had to be administered through my household. The sick would be referred to me, but the soup kitchen would be too far away; and I found it more convenient to dispense sick diet from my own house. I gave away a great deal of coal in cases of sickness, from my own house, especially on snowy days, to children who could not pick coal on the railroad. I gave away a great deal of bedding, off my own bed, in cases of confinement, jellies and delicacies of that nature, and especially in cases of sickness, I would always supplement it with a little cash; and all this benevolent work, in cases of confinement and various cases of distress, came out of this $15,600. I could not possibly separate it from my own private larder or storage, and as a matter of economy I deemed it best to dispense it from my house instead of having a separate room with attendant, and such agencies as· are usually maintained by the church at considerable expense. This $15,600 was not salary, unless you understand that out of my private salary I maintained these agencies."

The appellant was abundantly corroborated upon this point. John H. Crilley, a vendor of produce, testified that whenever he stopped at the appellant's house " Mrs. Daniel would give me money and tell me to deliver it in the neighborhood.''

Also, " that she bought potatoes, cabbage and such stuff as that which I had on my wagon; if it suited, I was to deliver it. She would buy goods and pay me for it before I delivered it; then I would take it to these people. I have been in the village now for four years and better, and ever since she has been dealing with me it has been going on, once or twice, sometimes once a week, sometimes twice."

Georgiana Burton testified that she knew of the distribution of charities from Mr. Daniel's house; that she had seen them give away things; that she had seen them go to drawers and take things out that they had bought and sent to people and given to them that came for them; that she had seen them go to drawers and take out sheets and pillow cases and take blankets off the bed and give to them; that she had seen them give away clothes to bury children in; that she had seen them give away food that they had bought for themselves or for the poor; that she had seen people come to the house with bags and things to get coal in; that sometimes six or seven, other days three or four, persons waiting before breakfast for the appellant; and that often persons were fed on the appellant's premises.

Mrs. Biggard testified that when she was destitute and in distress Mr. Daniel always helped her; he had given her money, as high as five dollars at a time; had given her one grocery order after another. He sent her coal. To use her own words, " He came and picked my husband up when the big churches would not notice him, and made a man of him." The same witness further testified that the appellant distributed coal and kitchen groceries at Christmas.

We need not further refer to the testimony upon this point. It was abundantly sufficient to corroborate the appellant, and to show that the drain upon his income for charitable purposes was by no means inconsiderable. The learned master, however, finds that these charities were covered by the $2,400 which the appellant paid out in small sums without taking receipts. This finding is not only without evidence to sustain it but is in direct conflict with the testimony of the appellant already referred to.

If the appellant had intended any fraud, it is incredible that he should have noted every item, however small, received by

him as contributions. The omission to keep such an account would have enabled him to perpetrate a fraud without fear of detection, while keeping it, revealed every transaction, and in case of fraud made detection not only possible but probable.

During all the years that the appellant was carrying on his work there were infrequent meetings of the trustees, and those only at long intervals. The appellant appears to have managed matters in his own way without interference on the part of the trustees. As before stated, no salary or compensation was fixed, and appellant was allowed to use the funds not contributed for special purposes, for the support of himself and family, and for charity, in his own discretion. It is unreasonable, after this course of dealing for ten years and nine months, to now call upon him for an account of every trifling disbursement made in the course of his administration of the affairs of the mission. As before observed, a considerable amount appears to have been disbursed in charity, in which, from the necessity of the case, no record could conveniently be kept of items. In such a work among the poor it would be unreasonable to expect an account of each plate of soup, each pound of coal, groceries, or other provisions, or each garment given to the poor. There must be some confidence reposed in some one in carrying on such work, and the confidence reposed in the appellant in this case does not appear to have been abused. At least the evidence does not show it.

As the appellant carried on his work with reasonable success, and without pecuniary aid from the plaintiffs or from the church, and had paid over to his co-trustee the considerable sum of $15,836.46 for the permanent objects of the mission, the plaintiffs might well have permitted him to retain the moderate compensation claimed by him, and thus have avoided the costs of this expensive and not very creditable litigation.

The decree is reversed, and the bill dismissed at the costs of the appellees.